PAUL B. SNYDER
United States Bankruptcy Judge
1717 Pacific Ave, Suite 2209
Tacoma, WA 98402

✓ FILED
___ LODGED
___ RECEIVED

**November 30, 2007**

MARK L. HATCHER
CLERK U.S. BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA
_____ DEPUTY

# UNITED STATES BANKRUPTCY COURT
# WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| In re:<br><br>CALLEN JAMES BLACKBIRD,<br><br>                    Debtor. | Case No. 06-43180 |
| CALLEN JAMES BLACKBIRD,<br><br>                    Plaintiff,<br><br>    v.<br><br>WACHOVIA BANK; CITIZENS BANK; KEY BANK, NA; BANK OF AMERICA; SALLIE MAE, INC.; AMERICAN EDUCATIONAL SERVICES; THE EDUCATION RESOURCES INSTITUTE (TERI),<br><br>                  Defendants. | Adversary No. 07-4039<br><br>**MEMORANDUM DECISION**<br><br>**NOT FOR PUBLICATION** |

Trial was held in this matter on October 22, 2007. Plaintiff Callen James Blackbird (Debtor), in accordance with his complaint, seeks to have the debts owed to Defendants Educational Credit Management Corporation[1] (ECMC), KeyBank, NA (KeyBank), Sallie Mae,

---

[1] On April 2, 2007, ECMC was substituted into these proceedings for Sallie Mae only as it related to the Debtor's Federal Family Education Loan Program (FFELP) Consolidation Loan.

MEMORANDUM DECISION - 1

Inc. (Sallie Mae), The Educational Resources Institute (TERI), and American Education Services (AES) declared discharged pursuant to 11 U.S.C. § 523(a)(8)[2]. The Debtor and ECMC, KeyBank, Sallie Mae, TERI, and AES (collectively referred to as Defendants) entered into a Joint Pretrial Order (Pretrial Order) regarding stipulated facts that was approved by the Court on October 19, 2007. At the conclusion of the trial, the Court took the matter under advisement. This Memorandum Decision shall constitute Findings of Fact and Conclusions of Law as required by Fed. R. Bankr. P. 7052. This is a core proceeding under 28 U.S.C. § 157(b)(2), as it is both a matter that arises in a case under Title 11 and a matter that arises under Title 11. The Court has the jurisdiction to enter a final order under 28 U.S.C. § 1334(b) and 28 U.S.C. § 151.

On August 31, 2007, an order of default was entered against Defendants Wachovia Bank and Citizens Bank. On October 4, 2007, an order of default was entered as to Defendant Bank of America, and the debts owed to Defendants Wachovia Bank, Citizens Bank and Bank of America were discharged pursuant to 11 U.S.C. § 523(a)(8).

Based on the evidence, pleadings and testimony presented at trial, the court's findings of fact and conclusions of law are as follows:

**I**

**FINDINGS OF FACT**

Most of the facts of this case are not in dispute, and as previously indicated were the subject of a Pretrial Order stipulated to by the parties.

---

[2]Unless otherwise indicated, all "Code," Chapter and Section references are to the Federal Bankruptcy Code, 11 U.S.C. §§ 101-1532, as amended by BAPCPA, Pub. L. 109-8, 119 Stat. 23, as this case was filed after October 17, 2005, the effective date of most BAPCPA provisions.

MEMORANDUM DECISION - 2

## A. Callen James Blackbird

The Debtor is currently 53 years of age and graduated from high school in 1972, college in 1976 with a degree in communications and thereafter spent much of his life attending an assortment of post secondary schools specializing in chiropractic and general medicine. The colleges and universities attended by the Debtor and the degrees earned are as indicated below:

| College | Degree | Date Earned | Attended |
|---|---|---|---|
| University of Wisconsin Green Bay | BS Communications | May 1976 | |
| Breneau University | Pre-Med | | May 1988 – August 1989 |
| Life College, School of Chiropractic | Doctor of Chiropractic | May 1993 | |
| Medical University of the Americas (West Indies and Belize) | Medicine | | January 2001 – December 2002 |
| St. Christopher's College of Medicine (Luton, England) | Medicine | | June 2003 – June 2005 |
| University of Missouri (Kansas City, Missouri) | Part I of board preparation | | January 2006 – May 2006 |

The Debtor's last 20 years of earnings as set forth on his Social Security Statement (Statement) are:

| Year | Social Security Income | Year | Social Security Income |
|---|---|---|---|
| 2006 | not yet recorded | 1996 | 0.00 |
| 2005 | 638.00 | 1995 | 10,966.00 |
| 2004 | 0.00 | 1994 | 24,300.00 |
| 2003 | 0.00 | 1993 | 10,983.00 |
| 2002 | 0.00 | 1992 | 7,990.00 |
| 2001 | 0.00 | 1991 | 7,549.00 |
| 2000 | 0.00 | 1990 | 7,333.00 |
| 1999 | 0.00 | 1989 | 8,742.00 |
| 1998 | 0.00 | 1988 | 24,478.00 |
| 1997 | 0.00 | 1987 | 2,085.00 |

MEMORANDUM DECISION - 3

The Debtor did not file Internal Revenue Service (IRS) tax returns for the years 2001 through 2004. Earnings from the Debtor's last few years as reported on his IRS tax returns are summarized as follows:

| Year | Wages, Salaries, etc. | Net Business Income | AGI | Federal Tax Refund/Due |
|---|---|---|---|---|
| 2006 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2005 | 0.00 | 690.00 | 641.00 | (49.00) |
| 2000 | 0.00 | 2,817.00 | 2,655.00 | (197.00) |

The testimony of the Debtor indicated that he commenced working as a chiropractor after receiving his degree in May, 1993. He initially worked as an employee at a chiropractic office, but was laid off in May, 1995, due to a lack of patients. He then became self-employed using his recreational vehicle (RV) as a mobile office, filling in for vacationing chiropractors. In June, 1994, he injured his shoulder while skydiving, and for a period of time his arm was in a sling. His earnings while working as a chiropractor from 1995 to 2000 were minimal, both because he experienced intermittent shoulder pain that interfered with his work as a chiropractor, and because the expenses of operating his mobile RV office, such as equipment purchases and managed care and malpractice insurance costs, often exceeded his income. The Debtor eventually came to the realization that due to the continuing low grade pain, he would have to seek alternative employment. The Debtor never sought or received medical treatment for his shoulder injury.

Rather than look for other work, the Debtor decided to attend medical school and was accepted into a foreign international program at the Medical University of the Americas. After attending the university for two years, he was unable to find placement into a clinical program (required for receiving a professional medical license in the United States), so he transferred to St. Christopher's College of Medicine. The Debtor attempted and failed on two occasions to pass the first of two written examinations that he testified were a prerequisite to practice as

MEMORANDUM DECISION - 4

a medical doctor. The last attempt to pass the first written examination was made in 2006. The Debtor testified that even assuming he could now pass the two required sets of oral and written examinations, the costs of taking the examinations, including tuition, travel and living expenses while studying for the exams, are not within his reach. The earliest residency he would be able to participate in would be in June, 2009, assuming that he could obtain transcripts from St. Christopher College, which he testified has ceased to operate as a medical school. Assuming as a foreign student he was accepted as a resident doctor, he would not become a medical physician until age 60. At that time, his employment would be limited due to his age, his shoulder injury, and the fact that he graduated from a foreign medical school.

After failing the first written examination a second time and believing that he did not have the ability to ever pass that examination, let alone the two oral and a second written examination that would ultimately be necessary to be licensed as a physician, he decided to give up his plan to become a licensed medical doctor. The Debtor testified that he applied for a number of other jobs, including those at health care related facilities, but was not hired because he was either over or under qualified. He tried for four days in 2005 to resume his occupation as a chiropractor but was unable to do so because of shoulder pain. The Debtor never sought out medical help after the initial shoulder injury, believing there was nothing that could be done to repair his shoulder, and did not have the time, money or medical insurance.

The Debtor eventually began working fulltime, in January, 2007, for Lowe's Home Furnishing Center (Lowe's) as a customer service representative, earning $11.82 per hour. Debtor is paid biweekly, thus receives 26 paychecks per year. His current income set forth below includes a $1,000 bonus normally not received. The parties stipulated in the Pretrial

Order that the Debtor's average wages[3] resulting from his paycheck stubs from January 27, 2007, through September 7, 2007, is indicated below:

|  | Annual | Monthly |
|---|---|---|
| **Gross** | 26,210.00 | 2,016.00 |
| **Net** | 21,934.00 | 1,661.00 |

The Debtor is a 53-year-old single person with no dependents. He resides in an 18-year-old recreational vehicle (RV) in a RV trailer park. He does not suffer from any medical condition that has been deemed by any physician to affect his ability to work. In addition to his RV, he owns a modest automobile and has minimal personal belongings. The Debtor does not own any real estate or significant assets.

The Debtor commutes ten minutes to work in his vehicle that has 80,000 miles, as taking a bus is not practicable. He has post bankruptcy attorney fee debt in excess of $8,000, and he testified he is in need of some dental work. The Debtor's monthly expenses set forth in detail in Plaintiff's Exhibit 15 are modest and total $2,177. He spends a significant amount of his income, however, eating at local restaurants and enjoys not only satellite TV and radio, but EarthLink. The Debtor has not taken a vacation in his recent memory and owns approximately $25,000 in assets. The Debtor continues to enjoy skydiving, which he testified costs him an average of $165 per year, and he recently spent several thousand dollars on photography equipment he can use while skydiving. His hope is to earn sufficient money from recording other skydivers so that he can skydive at little or no cost.

---

[3]The gross earnings as reflected on the paycheck stubs admitted as Debtor's Exhibit P1, for the stated time period, appear to reflect a lesser gross earnings than stipulated to by the parties.

MEMORANDUM DECISION - 6

The Debtor filed for bankruptcy protection on December 20, 2006, and a discharge was entered March 30, 2007. He subsequently filed this adversary proceeding on March 15, 2007, seeking discharge of his student loan debts pursuant to 11 U.S.C. § 523(a)(8).

### B.  The Student Loans

#### 1. Educational Credit Management Corporation

The loan held by ECMC is a FFELP Consolidation loan (ECMC Loan) previously held/serviced by Sallie Mae, and with United Student Aid Funds (USAF) as the original guarantor. ECMC acquired the loan from USAF through a guaranty transfer and is now the current guarantor of the loan. The ECMC Loan is described as (balance is current as of October 10, 2007):

| Loan Type | Loan Date | Guaranty Amount | Principal Balance | Interest Balance | Total | Interest Rate | Per Diem |
|---|---|---|---|---|---|---|---|
| Consol | 03/24/1994 | 68,035.97 | 210,754.27 | 7,166.51 | 217,920.78 | 9% | 51.97 |

A consolidation loan combines one or more student loans incurred while attending school, into one new loan. The loans that were consolidated into the ECMC Loan, approximately 11, were incurred during Debtor's attendance at Life College, School of Chiropractic to earn a degree and become a Doctor of Chiropractic Medicine.

Once the ECMC Loan was incurred, it was given a first payment due date of April 21, 1994. Debtor did not make any payments on the ECMC Loan from the first payment date of April 21, 1994, through the date the bankruptcy was filed. Debtor suspended all payments by application for unemployment deferment and hardship forbearance as follows:

| Suspension Type | Begin | End |
|---|---|---|
| Temporary Hardship Forbearance | 04/21/1994 | 09/21/1994 |
| Temporary Hardship Forbearance | 10/21/1994 | 03/21/1995 |
| Temporary Hardship Forbearance | 04/21/1995 | 10/20/1995 |
| Unemployment Deferment | 11/20/1995 | 04/09/1996 |
| Administrative Forbearance | 04/20/1996 | 04/30/1996 |
| Temporary Hardship Forbearance | 05/01/1996 | 09/20/1996 |

MEMORANDUM DECISION - 7

| Unemployment Deferment[4] | 10/20/1996 | 04/29/1997 |
| Unemployment Deferment | 05/20/1997 | 12/31/1997 |
| Unemployment Deferment | 01/01/1998 | 06/09/1998 |
| Temporary Hardship Forbearance | 06/10/1998 | 11/20/1998 |
| Temporary Hardship Forbearance | 11/21/1998 | 05/20/1999 |
| Temporary Hardship Forbearance | 05/21/1999 | 04/20/2000 |
| Temporary Hardship Forbearance | 04/21/2000 | 04/20/2001 |
| Temporary Hardship Deferment | 04/21/2001 | 04/20/2002 |
| Temporary Hardship Deferment | 04/21/2002 | 04/20/2003 |
| Administrative Forbearance | 04/21/2003 | 05/11/2003 |
| In-School Deferment | 05/12/2003 | 06/30/2004 |
| Temporary Hardship Deferment | 07/20/2004 | 07/19/2005 |
| Administrative Forbearance | 07/20/2005 | 08/04/2005 |
| Unemployment Deferment | 08/05/2005 | 12/31/2005 |
| In-School Deferment | 01/01/2006 | 06/28/2006 |
| Administrative Forbearance | 07/20/2006 | 12/28/2006 |
| Chapter 7 Bankruptcy Administrative Forbearance | 12/31/2006 | to be determined* |

*The administrative forbearance due to the filing of the bankruptcy is still active upon the ECMC Loan.

The ECMC Loan does qualify for the William D. Ford Federal Direct Loan Program (Ford Program).

**2. KeyBank, NA**

The total owed to KeyBank on the subject student loans is $330,866.22 as of January 11, 2007, with interest accruing on the principal balances at the rate of 7.67% per annum. The KeyBank loans are qualified education loans as defined by section 221(d)(1) of the Internal Revenue Code of 1986. The KeyBank loans are described as follows:

| Account Number | Loan Date | Payoff Balance | Payoff Balance Date | Interest Rate |
|---|---|---|---|---|
| 000000098390626421001 | 03/06/2002 | 39,814.14 | 01/11/2007 | 7.67% |
| 000000098390626421002 | 07/26/2002 | 60,632.31 | 01/11/2007 | 7.67% |
| 000000098390626421003 | 09/09/2002 | 79,492.61 | 01/11/2007 | 7.67% |
| 000000098390626421004 | 04/22/2003 | 9,147.75 | 01/11/2007 | 7.67% |
| 000000098390626421005 | 08/21/2003 | 31,292.69 | 01/11/2007 | 7.67% |
| 000000098390626421006 | 10/15/2003 | 12,463.44 | 01/11/2007 | 7.67% |
| 000000098390626421007 | 03/26/2004 | 73,800.59 | 01/11/2007 | 7.67% |
| 000000098390626421008 | 09/22/2004 | 24,223.29 | 01/11/2007 | 7.67% |

---

[4]The Pretrial Order set forth the end date for this unemployment deferment as April 29, 2007. It appears that the year is actually 1997.

MEMORANDUM DECISION - 8

| Total | | 330,866.82 | |
|---|---|---|---|

Debtor has made no payments on the KeyBank loans. The KeyBank loans do not qualify for the Ford Program.

### 3. Sallie Mae, Inc.

The loan that is held by Sallie Mae is a single Tuition Answer Loan (Sallie Mae Loan), an educational loan incurred for tuition and educational expenses related to attending a medical board preparation program at the University of Missouri, Kansas City, Missouri. The Sallie Mae Loan was disbursed in connection with the medical board preparation program that commenced on January 17, 2006. The first of 240 monthly payments in the amount of $337.55 was due on February 20, 2007. The Sallie Mae Loan is described as follows:

| Loan Type | Loan Date | Loan Amount | Balance Date* | Approximate Loan Balance | Interest Rate |
|---|---|---|---|---|---|
| Tuition Answer Loan | 12/23/2005 | 32,085.86 | 03/15/2007 | 35,140.82 | 9.75% |

*Filing date of adversary proceeding

Debtor has made no payments on the Sallie Mae Loan. Debtor filed his Chapter 7 petition within one year after the Sallie Mae Loan was disbursed, and prior to the date any payments became due.

### 4. The Education Resources Institute

The Education Resources Institute (TERI) is the guarantor and current holder of five promissory notes described as:

| Loan[5] | Disbursement Date | Principal Disbursed | Balance Date | Balance Amount | Current Interest Rate* |
|---|---|---|---|---|---|
| 001 | 02/08/2001 | 2,290.50 | 10/01/2007 | 2,870.50 | 8.25% |
| 002 | 03/29/2001 | 18,379.89 | 10/01/2007 | 28,859.37 | 10.25% |
| 003 | 08/13/2001 | 20,108.70 | 10/01/2007 | 26,253.83 | 8.25% |

---

[5]Loan numbers are not sequential; no loan 005 was referenced in the Pretrial Order.

MEMORANDUM DECISION - 9

| | | | | | |
|---|---|---|---|---|---|
| 004 | 03/01/2005 | 27,472.53 | 10/01/2007 | 33,490.98 | 7.82% |
| 006 | 04/17/2006 | 12,500.00 | 10/01/2007 | 14,649.06 | 9.25% |
| Total | | 80,751.62 | | 106,123.74 | |

*All loans are variable rate loans, rate shown represents current rate.

Debtor suspended payments by application for temporary hardship forbearance as follows:

| Suspension Type | Loan | Begin | End |
|---|---|---|---|
| Temporary Hardship Forbearance | 001 | 09/18/2005 | 03/17/2006 |
| Temporary Hardship Forbearance | 002 | 11/11/2005 | 05/10/2006 |
| Temporary Hardship Forbearance | 006 | 04/18/2006 | 04/17/2007 |

Debtor has made no payments on the TERI loans. The TERI loans are educational benefit loans made by a program funded in whole or part by a nonprofit institution. All five loans are private and are not eligible for the Ford Program.

### 5. American Educational Services

American Educational Services (AES) serviced the loans owed by Debtor to KeyBank. (See ¶ 2.) AES serviced two TERI loans (Nos. 004 and 006). (See ¶ 4.) Debtor has made no payments on the loans serviced by AES.

### C. Summary of Student Loans

| Loan Holder | Balance Amount | Current Interest Rate* | Est. Monthly Payment Amount** |
|---|---|---|---|
| ECMC*** | 217,920.78 | 9% | 266.67 |
| KeyBank | 330,866.82 | 7.67% | 2,353.68 |
| Sallie Mae | 35,140.82 | 9.75% | 337.55 |
| TERI**** | 106,123.74 | 8.76% | 1,005.28 |
| Total | 690,052.16 | | 3,963.18 |

*Many of the loans are variable rate loans, the rate shown here is the current rate.[6]
**Student loans have flexible repayment terms, and repayment plans are fluid, with monthly payment amounts increasing or decreasing depending on the needs of the borrower and the account.
***This monthly payment amount is the Income Sensitive Repayment Plan amount if the ECMC

---

[6]The Pretrial Order only reflected that a variable rate of interest applied to the TERI loans.

MEMORANDUM DECISION - 10

loans were reconsolidated into the Ford Program.
\*\*\*\*Interest rate reflects average rate for the five loans held by TERI.

## II

## CONCLUSIONS OF LAW

The burden of proof under 11 U.S.C. § 523(a)(8) is initially on the lender to establish the existence of the debt, and that the debt is owed to, insured, or guaranteed by a governmental agency or nonprofit institution, or was incurred for an obligation to repay funds received as an educational benefit, scholarship or stipend. There is no dispute that this initial burden has been met. The burden of proof then shifts to the debtor to establish undue hardship within the meaning of § 523(a)(8). Raymond v. Northwest Educ. Loan Ass'n. (In re Raymond), 169 B.R. 67, 69-70 (Bankr. W.D. Wash. 1994) (citing The Cadle Co. v. Webb (In re Webb), 132 B.R. 199, 201 (Bankr. M.D. Fla. 1991)).

There is no statutory definition of "undue hardship." In the case of Pena v. United Student Aid Funds, Inc. (In re Pena), 155 F.3d 1108, 1112 (9th Cir. 1998), the Ninth Circuit Court of Appeals adopted a three-prong test set forth in Brunner v. New York State Higher Educ. Servs. Corp. (In re Brunner), 831 F.2d 395, 396 (2d Cir. 1987). Under this standard, the Debtor must establish

> (1) that the debtor cannot maintain, based on current income and expenses, a minimal standard of living for [the debtor] and [any] dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

Brunner, 831 F.2d at 396.

Under the Brunner test, "the burden of proving undue hardship is on the debtor, and the debtor must prove all three elements before discharge can be granted." Rifino v. United

MEMORANDUM DECISION - 11

States (In re Rifino), 245 F.3d 1083, 1087-88 (9th Cir. 2001) (citing In re Faish, 72 F.3d 298, 306 (3d Cir. 1995)). "If the debtor fails to satisfy any one of these requirements, 'the bankruptcy court's inquiry must end there, with a finding of no dischargeability.'" Rifino, 245 F.3d at 1088 (quoting Faish, 72 F.3d at 306).

The first prong of the Brunner test requires an examination of the Debtor's current income and expenses to ascertain if payment of the loan would cause his standard of living to fall below that minimally necessary if he is required to repay his student loans. The Defendants challenge several of the Debtor's expenses, such as the amount he spends on restaurant meals, expenses related to skydiving, and internet/cable services. Assuming these expenses are not reasonably necessary and that they are reduced by several hundred dollars a month as proposed by the Defendants, there still would be little remaining every month after deducting the Debtor's current expenses from current income. The evidence does not establish that such a modest decrease in the Debtor's expenses would be adequate to fully amortize or even pay interest on the entire amount of his student loan debt.

The second prong of the Brunner test that examines future finances, requires the Debtor establish that additional circumstances exist indicating that his state of affairs is likely to persist for a significant portion of the repayment period. The "additional circumstances" under the second prong need be exceptional only in that they "demonstrate insurmountable barriers to the" debtor's ability to repay the student loan. Nys v. Educational Credit Mgmt. Corp. (In re Nys), 446 F.3d 938, 946 (9th Cir. 2006). Applying this standard, the Debtor must establish "by a preponderance of the evidence that, for a substantial portion of the loan repayment period, [he] would not be able to maintain even a 'minimal' standard of living if" he

MEMORANDUM DECISION - 12

was required to pay the full amount of the student loan debt. Carnduff v. U.S. Dep't of Educ. (In re Carnduff), 367 B.R. 120, 129 (9th Cir. BAP 2007).

In the instant case, the Debtor is 53 years of age and owes in excess of $700,000 as of the writing of this decision. Estimated monthly payments on the student loan debts are approximately $4,000. The Debtor's current net pay is less than $2,000 each month, and his expenses equal or exceed his income. The Debtor is relatively healthy considering his age, and he is well educated. Although in the past he has worked as a chiropractor, he subsequently became injured and testimony indicates is no longer physically able to continue in that occupation due to his shoulder injury. Assuming that the Debtor has the means to have his shoulder repaired, which he should be able to do once he obtains medical insurance through his current employment by satisfying the requisite time period, there is no indication that he will be any more successful monetarily than he was while working as a chiropractor in the years 1995 to 2000. During this period of time he had only one year where his income exceeded his expenses. The Debtor's testimony indicates that he could not find an employee position as a chiropractor in 1995 when he obtained his license and was forced to become self-employed. There is no evidence that he would be more successful 12 years later at the age of 53, or that he would earn proportionally more than he did in 1994. Assuming he could attract a patient base, his shoulder could be repaired, and if he could not find an associate position, there would be substantial start-up expenses, such as professionally liability insurance, re-education, equipment costs and office rent and overhead, in order to become once again self-employed. The Debtor has no assets that he could sell or savings to draw upon to fund these expenses. It is doubtful that considering his age, debt and financial

circumstances he could find financing to give him an opportunity to become financially successful as a chiropractor.

The Debtor is well educated, however, his education is of little value if he cannot practice as a chiropractor. His basic job skills appear to be minimal. The Debtor testified that he applied for work at hospitals and in other health care related facilities, but was not hired, and even if he obtained such a position, the salary was not equal to what he is currently earning. The Defendants provided no evidence as to any employment positions for which he would qualify that would allow him to earn more than he is currently earning. Certainly, there is no evidence that the Debtor is qualified now, or that retraining or relocation would qualify him in the future, for any employment that would allow him to pay his student debt in full. The Debtor indicated he could not accept additional part-time work since he has to be available due to his "on call" status at Lowe's. Even assuming that he could locate additional work, considering the size of his debt, there is no evidence that even the interest on the debt could be paid.

The Court concludes that a preponderance of the evidence indicates that additional circumstances exist indicating that his state of affairs is likely to persist for a significant portion of the repayment period.

The third prong of the Brunner test requires that the Debtor prove that he has made good faith efforts to repay the loans. The Defendants suggest that the Debtor recklessly incurred enormous student loan debt over a lengthy period of time for which he intentionally has made no payment. The size of the debt as recognized by the Ninth Circuit Bankruptcy Appellate Panel can cut both ways. Carnduff, 367 B.R. at 137. It is difficult to imagine that the Debtor, as he continued to take out student loans and his prospects for becoming a

MEMORANDUM DECISION - 14

practicing physician became more remote, thought he would ever be able to pay his ever increasing student loan debt. It is likewise difficult to imagine that these Defendants would continue to advance the Debtor the amounts they did and at the same time expect that they would get paid in full. Both gambled that the Debtor would become a practicing physician, since this would be the only employment that could possibly allow him to repay his enormous student loan debt.

A finding of good faith turns on such factors as the Debtor's efforts to make payments on his student debt, the amount of time between when the loans first became due and when the Debtor sought discharge of the same, whether he maximized his employment income and minimized his expenses, and whether he sought to participate in repayment options. See Pobiner v. Educational Credit Mgmt. Corp. (In re Pobiner), 309 B.R. 405, 420-21 (Bankr. E.D.N.Y. 2004). The failure to make payments is not conclusive as to whether the Debtor has made good faith efforts to repay his student debt, particularly if he did not have the resources to make a payment. Polleys v. Educational Mgmt. Corp. (In re Polleys), 356 F.3d. 1302, 1311 (10th Cir. 2004). Good faith should not be used as a means for courts to impose their own values. Polleys, 356 F.3d at 1310.

The Debtor's first loans are held by ECMC. The first payment date was April 21, 1994, and although he made no payments, he was granted continuous temporary hardship, unemployment or administrative deferments through 2006. The Debtor may have qualified for the Ford Program, but due to his nonexistent income during the aforementioned period and the fact that he was approved for ECMC deferments, it cannot be considered a lack of good faith to not have entered into the Ford Program. Additionally, when the Court considers the Debtor's lack of or small amount of available net income, along with the substantial amount of

MEMORANDUM DECISION - 15

debt on the other loans that would need to be paid and the possible adverse tax consequences, the Court concludes it is not a lack of good faith for him not to have applied for acceptance into the Ford Program.

The Debtor also has student loans with KeyBank, Sallie Mae and TERI that were presumably used to fund his ill-fated attempt to become a physician. These do not qualify for the Ford Program, and no payments were made on any of these loans.

The Defendants' arguments reflect well-founded frustration that the Debtor could incur such substantial student loan debts, make no payments, and summarily abandon his attempt to become a practicing physician, the only position in which he would even have a remote chance of repaying the debts. Fault cannot be attributable to a debtor, however, who makes a choice as to which skill he will pursue in seeking an education, even though it later turns out that the income is insufficient or that the debtor lacks the skill necessary to repay the student loan debt. Nys, 446 F.3d at 945, n.6.

The Court concludes that a preponderance of the evidence indicates that the Debtor has met his burden of proof in establishing good faith with regard to the ECMC, KeyBank and TERI # 001 through #004 loans.

A preponderance of the evidence establishes that the Debtor has shown a lack of good faith with regard to taking out TERI # 006 and the Sallie Mae loans. The Sallie Mae loan was disbursed on December 23, 2005, in the amount of $32,085.86, with the first payment due on February 20, 2007. The TERI loan #006 was belatedly disbursed on April 17, 2006, in the amount of $12,500. These student loans required that any disbursement be used for expenses directly related to education. He had already completed his schooling, but had failed the first written examination once before. The tuition for the written examination held at

the University of Missouri was $8,100 and the on campus living expense was $2,420 for the three month course. The course was to commence on January 17 and terminate on April 28, 2006. The Debtor, however, left without completing the course approximately 20 days early. He testified that although he was charged and paid for living on campus at the University of Missouri with the student loan proceeds, he used the money received from the Sallie Mae and TERI #006 loans for such items as transportation to the west coast and to relocate, repair and reside in his RV. He also admittedly paid miscellaneous other debts that had little to do with his course enrollment.

In summary, the most credible evidence indicates that the Debtor received within four months the sum of $44,585 to take a course at the University of Missouri that would prepare him to take a written examination. He only used a portion of the funds to pay tuition of $8,100, course materials and expenses while residing off-campus. The remaining substantial portion of the loan proceeds were used for transportation to and from the west coast, to repair his RV and for living and other miscellaneous expenses to relocate and live until he decided to take the examination. It appears that the Debtor did not work between April, 2006, and the time he filed bankruptcy on December 20, 2006, before the first payment was due on either loan, apparently using the loan proceeds to live on until he filed bankruptcy. The Debtor testified notwithstanding his failure to work, he was not prepared when he took and failed the examination in the winter of 2006. He did not advise TERI or Sallie Mae that he left the course early and never offered to return money left over after he terminated his participation in early to mid-April, 2006.

The Court concludes that the Debtor has failed to establish by a preponderance of the evidence that he acted in good faith with regard to either TERI #006 loan or the Sallie Mae

loan. The Debtor received the loan proceeds within one year of filing bankruptcy without attempting to pay back any of the proceeds that he used for non educational purposes. He left the course early, but yet cashed and used the TERI and Sallie Mae loan proceeds to pay other non education related debts, repair his RV and fly to the west coast. He cared so little that he paid $2,420 to the University of Missouri for a room he never used, and never attempted to correct his living arrangement with the university, or to return proceeds not used incident to his education. The Debtor's cavalier attitude toward repayment of student loans, that the taxpayers of the United States ultimately are responsible for, is not an indication of good faith. Since he cannot meet the good faith test, neither of these loans can be partially discharged.

Accordingly, the Court concludes that the student loans due ECMC, KeyBank and TERI #001 through 004 are discharged. The Sallie Mae and TERI #006 loan are not discharged.

DATED: November 30, 2007

*Paul B. Snyder*
_____
Paul B. Snyder
U.S. Bankruptcy Judge

MEMORANDUM DECISION - 18